UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| GOV. C.L. "BUTCH" OTTER, OFFICE OF SPECIES CONSERVATION, THEODORE HOFFMAN, SCOTT NICHOLSON, and L.G. DAVISON & SONS, INC., | Case No. 1:11-cv-00358-CWD **MEMORANDUM DECISION AND ORDER** |
| Plaintiffs, | |
| v. | |
| KEN SALAZAR, THOMAS STRICKLAND, SAM HAMILTON, and UNITED STATES FISH & WILDLIFE SERVICE, | |
| Defendants. | |

## INTRODUCTION

This case represents the fourth time since 2001 that a federal court has been asked to review a decision by the Secretary of the Interior concerning whether *Lepidium papilliferum* (commonly known as slickspot peppergrass) should be listed as an endangered or threatened species under the Endangered Species Act.[1] On October 8, 2009, the Secretary published a Final Rule in the Federal Register listing *L. papilliferum*

---

[1] A summary of the federal litigation involving *L. papilliferum* is set forth in Part 3 of the Background section below.

**MEMORANDUM DECISION AND ORDER - 1**

as a threatened species under the Endangered Species Act. 74 Fed. Reg. 52014. Following

the listing, Idaho Governor C.L. "Butch" Otter, the Idaho Office of Species

Conservation,[2] Theodore Hoffman, Scott Nicholson, and L.G. Davison & Sons, Inc.[3]

(collectively "Plaintiffs") brought the present action against the United States Secretary of

the Interior Ken Salazar and the United States Fish and Wildlife Service (the "Service")[4]

challenging the listing under the Administrative Procedures Act ("APA") and the

Endangered Species Act ("ESA"). All parties have consented to proceed before a

Magistrate Judge pursuant to 28 U.S.C. § 636(c).

Plaintiffs challenge the listing on four grounds.[5] First, Plaintiffs argue that the

listing was not based upon "the best available science" in contravention of the ESA.

Second, Plaintiffs argue that, under the ESA, a species only may be listed as "threatened"

if it "is likely to become an endangered species within the *foreseeable future*," and that

---

[2] The Office of Species Conservation is an agency within the executive office of the Governor and is tasked with coordinating and implementing programs related to listed species (or species that have been petitioned to be listed) under the Endangered Species Act.

[3] Theodore Hoffman, Scott Nicholson and L.G. Davison & Sons, Inc., are signatories to a conservation agreement previously entered into between the State of Idaho, federal agencies, and federal livestock grazing permitees related to slickspot peppergrass. Messrs. Hoffman and Nicholson conduct cattle ranching operations in the State of Idaho.

[4] Plaintiffs also name Thomas Strickland (the Assistant Secretary for Fish, Wildlife and parks within the United States Department of the Interior) and Sam Hamilton (the Director of the United States Fish and Wildlife Service) as individual defendants.

[5] Plaintiffs actually list five grounds in their motion for summary judgment, but the first two both fall within the rubric of the best available science requirement.

**MEMORANDUM DECISION AND ORDER - 2**

the Service failed to provide an adequate definition of "foreseeable future" in the Final

Rule. Third, Plaintiffs argue that the Final Rule improperly discounted the significance of

the Governor's conservation efforts. Finally, Plaintiffs argue that the Secretary failed to

provide the State of Idaho with a letter outlining the justifications for the listing, which is

required under Section 4 of the ESA when a state files comments disagreeing with all or

part of a proposed regulation and the Secretary issues a final regulation in conflict with

the state's comments. Based on these alleged deficiencies, Plaintiffs argue the Final Rule

listing slickspot peppergrass as a threatened species does not comply with the statutory

requirements contained in the ESA and that the listing is arbitrary and capricious under

the APA. Plaintiffs request that the Court vacate, reverse, and remand the listing.

The Federal Defendants argue that the Final Rule complies with both the ESA and

the APA. Moreover, and notwithstanding the fact that the Governor of the State of Idaho

participated as an intervenor (in support of the Service and the Secretary) in two previous

lawsuits filed by an environmental group challenging the Secretary's decision *not* to list

slickspot peppergrass as a threatened species, the Secretary now argues that none of the

plaintiffs in this case (including the Governor) have standing to challenge the Final Rule.

Before the Court are the parties' cross motions for summary judgment. (*Pl.s' Mot.

for Summ. J.*, Dkt. 38; *Def.s' Mot. for Summ. J.*, Dkt. 42.) The parties presented oral

arguments on the motions on May 22, 2012. The Court has reviewed the administrative

record, (Dkt. 34 and 35), the motions have been fully briefed, and the case is ripe for

adjudication. For the reasons set forth below, the Court finds that the Service's failure to

**MEMORANDUM DECISION AND ORDER - 3**

define "foreseeable future" requires reversal of the listing and remand to the Service for

further consideration.

## BACKGROUND

**1.     Legal Background**

Congress enacted the ESA to provide "a means whereby the ecosystems upon

which endangered species and threatened species depend may be conserved, [and] to

provide a program for the conservation of such endangered species." 16 U.S.C. § 1531(b).

Section 4 of the ESA directs the Service to determine whether any species should be

listed as endangered or threatened. 16 U.S.C. § 1533(a)(1). A species is "endangered" if it

"is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. §

1532(6). A species is "threatened" if it "is likely to become an endangered species within

the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. §

1532(20).

The ESA requires the Secretary to determine whether any species is endangered or

threatened "because of any" of the following five factors:

(A) the present or threatened destruction, modification, or curtailment of its habitat

or range;

(B) overutilization for commercial, recreation, scientific, or education purposes;

(C) disease or predation;

(D) the inadequacy of existing regulatory mechanisms; or

(E) other natural or manmade factors affecting its continued existence.

**MEMORANDUM DECISION AND ORDER - 4**

16 U.S.C. § 1533(a)(1). Although the Service outlines all five of the above factors in the Final Rule published in 2009, the agency's decision to list slickspot peppergrass was based primarily on factor A – "the present or threatened destruction, modification, or curtailment of [the species'] habitat or range."

The ESA also dictates that the decision to list a species must be based "solely on the basis of the best scientific and commercial data available to [the Secretary] after conducting a review of the status of the species and after taking into account those efforts, if any, being made by a State or foreign nation . . . to protect such species, whether by predator control, protection of habitat and food supply, or other conservation practices, within any area under its jurisdiction . . . ." 16 U.S.C. § 1533(b)(1)(A).

In addition, the Secretary is required to consult with the affected states when considering whether to list a species as endangered or threatened and to "tak[e] into account those efforts . . . being made by any State . . . to protect such species" under existing "conservation practices." 16 U.S.C. § 1533(b)(5)(A)(i) & (ii).

Once a species is listed, various safeguards prevent activities that will cause harm to members of the species or that will jeopardize the survival and recovery of the species. 16 U.S.C. §§ 1536, 1538. The ESA's ultimate goal is recovery of listed species to the point that ESA protection is no longer necessary. 16 U.S.C. § 1531(b) and (c), 1532(3).

## 2.    Slickspot Peppergrass (*L. papilliferum*)

The following facts are taken from the Final Rule issued in October of 2009 and do not appear to be disputed by the parties. Slickspot peppergrass is a small, flowering

**MEMORANDUM DECISION AND ORDER - 5**

plant in the mustard family. (Administrative Record ("AR") 0002.) The species is

endemic to this region, known only from the Snake River Plain and its adjacent northern

foothills, with a smaller disjunct population on the Owyhee Plateau. (*Id*.) Slickspot

peppergrass has never been found outside of Idaho. The plant grows in unique microsite

habitats known as slickspots, which are found within the semiarid sagebrush-steppe

ecosystem of southwestern Idaho. (*Id*.)

The slickspots themselves have been described as small circular patches of ground

with unusual soil chemistry that create visually distinct openings in the surrounding

sagebrush environment. Slickspots are distinguished from the surrounding sagebrush

matrix as having the following characteristics: microsites where water pools when rain

falls, sparse native vegetation, distinct soil layers with a columnar or prismatic structure,

higher alkalinity and clay content and natric properties, and reduced levels of organic

matter and nutrients. (AR 0006.) Most slickspots are between 10 square feet and twenty

square feet in size, although some are as large as one hundred and ten square feet. (AR

0007.) Scientists believe that the slickspots found on the Idaho rangelands likely formed

during the Pleistocene era and took thousands of years to form. Once destroyed, it is

believed that slickspots cannot be re-created.

Slickspot peppergrass is moncarpic, meaning it flowers once and then dies, and

displays two different life history strategies – an annual form and a biennial form. (AR

0003.) The above-ground plants represent only a portion of the species' population and

slickspot peppergrass has a long-lived seed bank, likely as an adaptation to unpredictable

**MEMORANDUM DECISION AND ORDER - 6**

conditions, in which years of good rainfall favorable for germination and survival may be followed by periods of drought. (AR 0010.) A persistent seed bank provides a population buffer against years of poor reproductive potential in such a highly variable environment. (*Id*.) Only a small percentage of slickspot peppergrass seeds germinate annually, resulting in an estimated maximum longevity of 12 years for seeds in the seed bank. (*Id*.) The Service recognizes that the number of above-ground plants that can be counted in any one year represents only a subset of the latent population that is present in the seed bank. (*Id*.) Given this fact, "estimating the number of above-ground plants is by itself not a reliable measure to evaluate population and species viability." (AR 0011, quoting Mancuso and Moseley (1998, p. 1)).

The Idaho Natural Heritage Program ("INHP") uses element occurrences ("EOs") to broadly describe the distribution of slickspot peppergrass and assigns rankings to each EO based on measures of habitat quality and species abundance. (AR 0005.) EOs are defined by grouping occupied slickspots that occur within on kilometer of each other. (*Id*.) Each EO is assigned a qualitative rank defined by population size and habitat quality. (*Id*.) EO ranks are periodically updated when new ranking information becomes available.

In addition to the EO system, there have been four programs designed to monitor populations of slickspot peppergrass. The Habitat Integrity Index ("HII") conducted by the Idaho Conservation Data Center ("ICDC" now the INHP) was the first rangewide effort aimed at monitoring slickspot peppergrass. The HII was initiated in 1998 and ran

**MEMORANDUM DECISION AND ORDER - 7**

for 5 years through 2002. (AR 0005.) Monitoring was initially based on a system of transects of varying lengths across the range of slickspot peppergrass, each subjectively located to include 10 slickspots on sites known to contain slickspot peppergrass. (*Id*.) The primary goal of the HII methodology was to assess the overall habitat condition.

In 2004, the HII was replaced by the Habitat Integrity and Population monitoring protocol ("HIP"), which also was implemented by the ICDC. HIP monitoring has been conducted annually since its implementation (from 2004 through 2008). HIP presents measures of habitat, disturbance, and plant community attributes at each transect as well as counts of slickspot peppergrass rosettes and reproductive plants observed. (AR 0005.) HIP is based on transects of varying lengths subjectively located to include 10 slickspots along their lengths. (*Id*.) The monitoring has been annually conducted since 2004 and consists of the following procedures: (1) establish and permanently mark HIP transects; (2) record location information; (3) take photographs; (4) measure population, habitat, and disturbance attributes at selected slickspots; (5) measure plant community attributes; and (6) analyze and describe the results. (*Id*.)

In addition to the EO records and the HII-HIP monitoring programs (which cover the entire range of *L. papilliferum*), the Idaho Army National Guard has established two programs within its Orchard Training Area ("OTA"). The OTA is home to one of the largest and most expansive EOs of the species. (AR 0005.) Two of the OTA programs have been monitoring the same locations annually since the early 1990's, providing up to 18 years of population data for slickspot peppergrass. (*Id*.) These two monitoring

**MEMORANDUM DECISION AND ORDER - 8**

programs are known as rough census areas and special-use plots. In the rough census areas, counts are conducted by technicians who walk across parallel transects and record the number of slickspot peppergrass observed. Not all areas have been monitored in all years, requiring the data to be standardized. The special-use plots are a series of 16 belt transects on the OTA, each containing a single slickspot. (AR 0005-0006.) A stake is centered in each slickspot, and each year the number of slickspot peppergrass individuals with a 16.4 ft radius of that stake are counted. (AR 0006.)

The data generated from the above monitoring programs indicates that the numbers of slickspot peppergrass can vary dramatically from year to year, depending on environmental conditions. (AR 0011.)

**3.      Listing History and Prior Litigation**

The decade-long battle between environmental groups, the State of Idaho, and the federal government over whether slickspot peppergrass should be listed as a protected species under the ESA is well chronicled in two previous cases before the Court – both of which were brought by an environmental group against the Secretary of the Interior after the Service published notices in 2004 and again in 2007 that it was withdrawing earlier proposals to list the species under the ESA. *See Western Watersheds Project v. Foss*, CV 04-168-MHW, 2005 WL 2002473 (D. Idaho 2005); *See also*, *Western Watersheds Project v. Kempthorne*, CV 07-161-MHW, 2008 WL 2338501 (D. Idaho 2008)). The facts involving the listing of slickspot peppergrass and the multiple litigations that thereafter ensued are provided below where relevant and are taken largely from the

**MEMORANDUM DECISION AND ORDER - 9**

Court's above-referenced decisions.[6]

In 2000, the Service began preparing a draft rule to list slickspot peppergrass as endangered under the ESA. *Western Watersheds Project v. Foss*, CV 04-168-MHW, 2005 WL 2002473 at *4 (D. Idaho 2005). The process was eventually halted due to alleged political reasons and the Service decided not to publish the proposed rule. *Id*. at *5. An environmental group filed a Listing Petition to compel the Service to list the species under the ESA. *Id*. The Service rejected the Listing Petition and the following year, the environmental group filed suit against the Service in the District of Oregon for violations of the ESA. *Id*. The suit resulted in a settlement agreement in which the Service agreed to submit for publication a listing proposal for slickspot peppergrass by July 15, 2002, and to make a final determination by July 15, 2003. *Id*.

On July 15, 2002, the Service proposed to list slickspot peppergrass as endangered under the ESA. (AR 0002, citing 67 FR 46441.) The Air Force thereafter filed a challenge with the Service in March of 2003, claiming the proposed rule violated the Information Quality Act. *Foss*, 2005 WL 2002473 at *7. A six-month extension occurred during which the Service solicited additional data, including submissions from a panel of experts. *Id*. At the end of the six-month period, the Service published notice that it was withdrawing the proposed rule to list the species under the ESA. *Id*. at *13. The decision to withdraw the proposed listing was based on the conclusion that there was insufficient

---

[6] The 2009 Final Rule also sets forth a truncated version of the litigation history involving *L. papilliferum*. (*See* AR 0002.)

MEMORANDUM DECISION AND ORDER - 10

evidence indicating a negative population trend. The withdrawal decision also referenced

conservation agreements and found that the conservation measures described in the

agreements would in fact be implemented. *Id.*

The first conservation agreement, and the one that Plaintiffs rely upon in their

present challenge to the 2009 Final Rule, is the Candidate Conservation Agreement

("CCA"), which was drafted originally in 2003, updated in 2006, and scheduled to expire

in 2013. (AR 0037.)[7] The parties to the CCA include the State of Idaho, the Bureau of

Land Management, nongovernmental cooperators (private landowners who also hold

BLM livestock grazing permits), and several other Federal and State agencies.[8] (AR

0037.) The Service states that the CCA "represents an important milestone in the

cooperative conservation of *Lepidium papilliferum* given its rangewide scope and

coordinated management across Federal and State of Idaho managed lands." (AR 0037.)[9]

_____

[7] The other conservation agreements referenced by the Service in its withdrawal decision were the Air Force and Idaho Army National Guard Integrated Natural Resource Management Plans. These plans contain measures that attempt to minimize the impacts from military training activities within areas reserved for conservation of *L. papilliferum*.

[8] The CCA was completed in December of 2003 by the BLM, the State of Idaho, the Idaho Army National Guard ("IDARNG"), and livestock permittees. As part of the CCA, several private landowners entered into MOUs with the State of Idaho, committing to conservation efforts on approx 17,000 acres of private land. 69 fed. Reg. 3113

[9] The CCA includes rangewide efforts intended to address the need to: maintain and enhance *L. papilliferum* habitat; reduce intensity, frequency, and size of natural and human caused wildfires; minimize loss of habitat associated with wildfire-suppression activities; reduce the potential for invasion of nonnative plant species from wildfire; minimize the loss of habitat associated with rehabilitation and restoration techniques; minimize the establishment of invasive nonnative species; mitigate the negative effects of military training and other associated activities on the OTA; and minimize the impact of

**MEMORANDUM DECISION AND ORDER - 11**

The Final Rule, published in 2004, stated: "We [the Service] believe that the conservation efforts will reduce the risk of fires in the foreseeable future within the range of the species" '69 Fed. Reg. 3115. Ultimately, the Service concluded that, based on a lack of data indicating population decline and conservation agreements, "we [the Service] believe that the species no longer is in danger of extinction throughout all or a significant portion of its range, nor is it likely to become endangered within the foreseeable future." 69 Fed. Reg. 3116.

On April 5, 2004, an environmental group filed an action against the Secretary of the Interior challenging the Service's decision to withdraw the proposed rule to list slickspot peppergrass. *Western Watersheds v. Foss*, CV 04-168-S-MHW. Governor Dirk Kempthorne (the Governor of Idaho at the time the action was instituted) filed a motion to intervene as a matter of right under Fed. R. Civ. P. 24(a), and the parties stipulated that the Governor would be allowed to intervene in the case. On August 19, 2005, this Court reversed the withdrawal decision. The Court took issue with the Service's failure to define "foreseeable future." *Id*. at *14. The Court recognized that the ESA does not define the term "foreseeable future" and that the Service has not promulgated any rules or regulations setting quantitative thresholds to define the term. *Id*. The Court also recognized that the definition of "foreseeable future" "may vary depending on the particular species." *Id*. at *16. For instance, the Court stated that, "'foreseeable future'

---

ground disturbances caused by livestock penetrating trampling during periods when soils are saturated. (*Id*.)

**MEMORANDUM DECISION AND ORDER - 12**

may be defined differently for a sequoia tree (the National Park Service indicates an age of 3,200 years for a mature tree) than for the slickspot peppergrass, which is an annual or biennial plant." *Id*. The Court, however, did not define "foreseeable future" for the slickspot peppergrass – leaving that decision to the Service – and expressly stated that the Court was "not attempting to establish a bright-line rule for defining foreseeable future." *Id*.

Notwithstanding the absence of a statutory definition, the Court held that the Service's failure to define the term was reversible error: "A mere statement that the conservation agreement 'will postpone the projected time when the species has a high risk of extinction to beyond the foreseeable future,' without first delineating how the FWS managers defined foreseeable future, does not suffice – especially when [definitions of foreseeable future in the context of the slickspot peppergrass were available and had been estimated by the scientists asked to address the issue]." *Id*. at *17. The Court reversed the decision to withdraw the proposed rule, "with directions that the case be remanded to the Secretary of the Department of Interior for reconsideration in accordance with the legal standards outlined in th[e] opinion." *Id*. at *19.

Following the Court's 2005 decision, the Service published a document in February of 2006 entitled "Draft Best Available Biological Information for Slickspot Peppergrass." *Western Watersheds Project v. Kempthorne*, CV 07-161-MHW, 2008 WL 2338501 at *4 (D. Idaho 2008). The document analyzed several data sources, including the data produced from the HII and HIP monitoring programs done by IDCDC and the

"census" data produced as part of the OTA program. *Id*. at *4-5. The document also described the factors affecting the species based on earlier findings, including non-native plant invasions, wildfire, livestock grazing, military training, residential and agricultural development, recreational vehicles, and others. *Id*. at *5.

In May of 2006, the Service convened a panel of seven scientists, with expertise in high desert plants, to review the above document. *Id*. These experts were to share their knowledge of slickspot peppergrass, apply that knowledge in exercises, and complete an extinction risk assessment. *Id*. The experts were asked to estimate the time-frame in which they thought the species might likely become extinct (as opposed to merely threatened) by allocating "chips" among time-frames ranging from the next 20 years to more than 200 years. *Id*. When the panelists made their decision on when slickspot peppergrass would likely become extinct, based on then-current conditions, the panelists placed seventy-five percent of the chips in the range of 21-100 years with the largest amount of chips in the 61-80 year time-frame. *Id*.

In May of 2006, four Service managers met with the expert panel to discuss how to apply the ESA to slickspot peppergrass. The managers defined "foreseeable future" as "not greater than 40 years based on considerations discussed in the manager panel." *Id*. at *6. In June of 2006, the Service convened a second manager panel. The second manager panel concluded that slickspot peppergrass should be listed as threatened. *Id*. On July 11, 2006, the Service prepared a final listing package. *Id*. at *7.

**MEMORANDUM DECISION AND ORDER - 14**

On September 19, 2006, Field Office Supervisor Jeff Foss alerted the Service's regional office that information had come out after the 2006 Best Available Biological Information document had been released for public comment. *Id*. The information included a report known as the Menke & Kaye report, providing statistical analysis for 20 of the 85 EOs, correlating spring precipitation with plant abundance. *Id*.

On September 28, 2006, the Service Director for Region 1 met with Idaho's United States Senators Craig, Crapo, and then-Congressman Otter. *Id*. During the meeting, the Idaho delegation expressed interest in having the Service consider the CCA in making its listing determination and expressed the concern that a listing could undermine the cooperative process and progress made through the conservation agreement. *Id*.

In November of 2006, the definition of foreseeable future was discussed, with a note that it was to be redefined to 20 years. *Id*. at *8.

Later in November of 2006, Mr. Foss sent a memo to Regional Assistant Director Terry Rabot, relating to information recently gathered concerning the OTA data collection methodology. *Id*. Mr. Foss concluded that: (1) the "census" data is more accurately characterized as survey data because it does not count every plant in the area surveyed – it is a "rough census"; (2) the "census" area represented 90% rather than 98% of the total occupied habitat at the OTA; (3) new surveys were finding previously undetected slickspots; and (4) that the Service's previous statements about the population trend at the OTA needed to be reconsidered in light of the new information. *Id*.

**MEMORANDUM DECISION AND ORDER - 15**

On November 21, 2006, the Service convened a third manager panel to discuss the new information. *Id*. "The panel concluded that it did not consider Slickspot peppergrass 'in danger of extinction throughout all or a significant portion of its range nor likely to become an endangered species within the foreseeable future throughout all of a significant portion of its range' based on its review of the new information." *Id*. at *9, quoting the administrative record. On November 29, 2006, the Service drafted a new rule detailing why the listing of slickspot peppergrass was not warranted and the withdrawal notice concluded that the species was not endangered or threatened in all or a significant portion of its range. *Id*.

Following the withdrawal notice, Western Watersheds Project once again filed suit against the Secretary of the Interior. *See Western Watersheds Project v. Kempthorne*, CV 07-161-MHW, 2008 WL 2338501 (D. Idaho 2008). As in the previous suit, the Governor of Idaho sought to intervene and all parties stipulated to the Governor's participation in the case. The Court once again reversed the decision to withdraw the rule listing slickspot peppergrass as a threatened species. The Court noted that the Service relied heavily upon the Menke and Kaye report and that, "[s]ince this was not included in the [2006 Best Available Information document], it was not peer reviewed nor examined by the Expert Science Panel." *Id*. at *14.

The Court held that, "[b]ecause of the reliance placed on this report, the FWS should have submitted this report to the experts for their reveiw to ensure that the FWS had the best available scientific information in front of it when making its listing

**MEMORANDUM DECISION AND ORDER - 16**

determination." *Id*. The logical course, according to the Court, "would have been to allow the prior Expert Science Panel, or a different group of experts, [to] consider and evaluate the new information and see if it would change the earlier extinction risk estimates." *Id*. at *15. The Court reversed the withdrawal decision and remanded the matter to the Service for further consideration consistent with the decision. *Id*.

Following the Court's 2008 remand order, the Service issued a notice of reinstatement of the July 15, 2002 proposed rule to list the species as endangered, and opened a public comment period. (AR 0002.) During the public comment period, the State of Idaho expressed concern with the upcoming rulemaking, stating:

> Given the controversy surrounding the data collected at the Orchard Training Area, the State requests an exhaustive, independent, third-party audit of the information collected at that site. Concurrent with that audit, the Service needs to examine both the use of that data in other scientific forums as well as the inferences the Service has drawn from such research. Without such an audit, the State would have little confidence in the Service's ability to correctly determine the appropriate listing status for the species.

(AR 237.)

Rather than re-submitting the OTA information to the science panel, which was the primary problem the Court addressed in the 2008 remand order, the Service contracted with statisticians Joseph Sullivan and Christopher Nations to perform an "Analysis of Slickspot Peppergrass (*Lepidium papilliferum*) Population Trends on Orchard Training Area and Rangewide Implications." (hereinafter "Sullivan and Nations Report"). Sullivan and Nations were asked by the Service to: (a) document data collection

**MEMORANDUM DECISION AND ORDER - 17**

methods at the Idaho Army National Guard Orchard Training Area; (b) statistically

analyze data; (c) compare methods from the "rough censes" to other survey efforts at the

Orchard Training Area; (d) better illustrate habitat quality at the Orchard Training Area;

and (e) compare OTA data with HIP monitoring. (Sullivan and Nations Report at 16.)

Sullivan and Nations concluded that there was "limited evidence for declining

populations," but that the evidence indicating declining populations was statistically

significant only for the rough census areas. (AR 0012.) Sullivan and Nations also found a

significantly negative relationship between the abundance or density of *L. papilliferum*

and the presence of *B. tectorum* (an invasive nonnative plant) and past fires. (AR 0013-

0014.) "These results contrast[ed] with the information that was available to [the Service]

at the time of [the] 2007 finding, which did not indicate any statistically significant

relationship between invasive nonnative plants and the abundance of *L. papilliferum*."

(AR 0023.)

On October 8, 2009, the Secretary listed *L. papilliferum* as a threatened species

under the ESA. The Final Rule states:

> We can . . . reasonably anticipate the impacts of the threats on
> *L. papilliferum* rangewide [primarily wildfires and invasive
> nonnative plants], and we believe those threats acting in
> combination are likely to result in the species becoming
> endangered within the foreseeable future.

(AR 0040.) The findings made by the Service in reaching this decision will be discussed

below in the section concerning the best available science standard under the ESA.

**MEMORANDUM DECISION AND ORDER - 18**

Plaintiffs filed this action on November 16, 2009, in the District of Columbia. (Dkt. 1.)  On January 15, 2010, Defendants moved the court to transfer the case to the District of Idaho, (Dkt. 11), and on June 21, 2010, the court granted the motion and transferred the case to Idaho. (Dkt. 20.)  Plaintiffs challenge the listing under the APA and the ESA and seek an order vacating, reversing, and remanding the listing decision.

## STANDARD OF REVIEW

Judicial review of final agency actions under the Endangered Species Act is governed by the Administrative Procedures Act. Under the APA, an agency action must be upheld unless it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Friends of Earth v. Hintz*, 800 F.2d 822, 830-31 (9th Cir. 1986). To decide if an agency action is arbitrary and capricious, the court must determine whether the agency considered the relevant factors and articulated a rational connection between the facts found and the choices made. *Pac. Coast Fed'n of Fishermen's Ass'n, Inc. v. NMFS*, 265 F.3d 1028, 1034 (9th Cir. 2001). As long as the agency decision was based on the relevant factors and there is no clear error of judgment, the reviewing court may not overturn the agency's action as arbitrary and capricious. *Arizona v. Thomas*, 824 F.2d 745, 748 (9th Cir. 1987).

"Deference to an agency's technical expertise and experience is particularly warranted with respect to questions involving . . . scientific matters." *United States v. Alpine Land and Reservoir Co.*, 887 F.2d 207, 213 (9th Cir. 1989). Nevertheless, the "presumption of agency expertise may be rebutted if the decisions, even though based on

**MEMORANDUM DECISION AND ORDER - 19**

scientific expertise, are not reasoned." *Greenpeace v. NMFS*, 80 F.Supp.2d 1137, 1147

(W.D. Wash. 2000). "Where an agency fails to articulate a rational connection between

the facts found and the choice made, the Court may not supply a reasoned basis for the

agency's action that the agency itself has not given." *Defenders of Wildlife v. Babbit*, 958

F.Supp. 670, 679 (D.D.C. 1997) (internal quotation marks and citations omitted).

Judicial review under this standard is to be "searching and careful," but remains

"narrow," and a court should not substitute its judgment for that of the agency. *Mt.*

*Graham Red Squirrel v. Espy*, 986 F.2d 1568, 1571 (9th Cir. 1993). An agency action

should be overturned only when the agency has "relied on factors which Congress has not

intended it to consider, entirely failed to consider an important aspect of the problem,

offered an explanation for its decision that runs counter to the evidence before the agency,

or is so implausible that it could not be ascribed to a difference in view or the product of

agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S.

29 (1983).

## DISCUSSION

**1.     Standing**

As a preliminary matter, Defendants argue that the Court need not reach the merits

in this case because Plaintiffs lack standing to challenge the Final Rule. (*See Mem. In*

*Support of Def.s' Mot. For Summ. J.* at 10, Dkt. 43.) Defendants devote a surprisingly

large amount of briefing on this issue considering that the Governor participated in the

previous two lawsuits and his participation was stipulated to by the Secretary of the

**MEMORANDUM DECISION AND ORDER - 20**

Interior. For the reasons set forth below, the Court finds that all the plaintiffs in this case have standing to challenge the Service's Final Rule.

Standing is a threshold jurisdictional prerequisite, and the "case and controversy" requirement of Article III of the Constitution requires plaintiffs to demonstrate that they have standing to sue. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The standing inquiry seeks to determine "whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). The party invoking federal jurisdiction bears the burden of proof in establishing all of the elements. *Lujan*, 504 U.S. at 561. To establish standing, Plaintiffs must establish the following three elements:

> First, the plaintiff must have suffered an "injury in fact" – an invasion of legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complaint of – the injury has to be fairly . . . trace[able] to the challenged action of the defendant, and not . . . the result [of] the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan*, 504 U.S. at 560-61.

### A.      The State's Standing

Defendants argue that the State of Idaho has failed "to demonstrate any actual injury." (*Def.s' Reply Br. In Supp. Of Mot. For Summ. J.* at 6, Dkt. 47.) The United States Supreme Court has recognized that special rules apply to states in the standing context.

**MEMORANDUM DECISION AND ORDER - 21**

*See Massachusetts v. E.P.A.*, 549 U.S. 497, 518 (2007) ("Well before the creation of the modern administrative state, we recognized that States are not normal litigants for the purposes of invoking federal jurisdiction.") Indeed, the Supreme Court has held that States are entitled to "special solicitude" in the standing analysis. *Id*. at 520. The statement by Justice Holmes in *Georgia v. Tennessee Copper Co.*, 206 U.S. 230 (1907), cited by the Supreme Court in *Massachusetts v. E.P.A.* in support of the proposition that the State had standing to sue the E.P.A., bears repeating here. In that case, one in which Georgia sought to protect its citizens from air pollution originating outside of its borders, Justice Holmes stated:

> The case has been argued largely as if it were one between two private parties; but it is not. The very elements that would be relied upon in a suit between fellow-citizens as a ground for equitable relief are wanting here. The State owns very little of the territory alleged to be affected, and the damage to it capable of estimate in money, possible, at least, is small. This is a suit by a State for an injury to it in its capacity of quasi-sovereign. In that capacity the State has an interest independent of and behind the titles of its citizens, in all the earth and air within its domain. It has the last word as to whether its mountains shall be stripped of their forests and its inhabitants shall breathe pure air.

*Tennessee Copper Co.*, 206 U.S. at 237.

Here, the injury alleged by the State is both actual and procedural – the Supreme Court has differentiated between the two types of injury and the State's procedural injury in this case will be discussed briefly below. Moreover, the factual allegations supporting the alleged injury are apparent in the administrative record, foreclosing any argument by

**MEMORANDUM DECISION AND ORDER - 22**

the Defendants that the Governor was required to produce something more at the

summary judgment stage of these proceedings.

The Final Rule in this case, and the forthcoming critical habitat designation, will

impact approximately 62,197 acres of lands within the State of Idaho. This alleged injury

is neither conjectural nor hypothetical; Section 4(a)(3) of the ESA and the implementing

regulations, 50 CFR 424.12, require that, to the maximum extent prudent and

determinable, the Secretary designate critical habitat at the time a species is determined to

be endangered or threatened. The Secretary has determined that it was not prudent to

designate critical habitat at the time of listing in this case, but that does not abrogate the

Secretary's responsibility to do so within a year. 16 U.S.C. § 1533(b)(6)(C)(ii). Once

designated critical habitat, the land would be subject to the full panoply of ESA

protections and restrictions. This would have the very real effect of restricting the use of

the land – whether owned by the State or a private individual. As in *Massachusetts v.

E.P.A.*, in this case the State of Idaho "owns a great deal of the territory alleged to be

affected . . . [which] only reinforces the conclusion that its stake in the outcome is

sufficiently concrete to warrant the exercise of federal judicial power." *Massachusetts*,

549 U.S. at 519.

Although Governor Otter does not specifically refer to the doctrine, the Court finds

that he (and the State) have procedural standing in this case. To establish procedural

standing, the plaintiff must show: (1) that it has been accorded a procedural right to

protect its concrete interests, and (2) that it has a threatened concrete interest that is the

**MEMORANDUM DECISION AND ORDER - 23**

ultimate basis of its standing. *Natural Resources Defense Council v. Salazar,* __ F.3d __, 2012 WL 2899095 (9th Cir. 2012); *Douglas County v. Babbitt*, 48 F.3d 1495, 1500-01 (9th Cir. 1995). Both requirements are met in this case.

The ESA carves out special procedures when a state chooses to participate in the listing process and requires the Secretary to provide the state with justifications when an agency action conflicts with the state's comments. *See* 16 U.S.C. § 1533(i). Here, the Governor alleges that this provision was not complied with. Indeed, a letter containing the Secretary's justifications was not provided to the State of Idaho until after this litigation was initiated. The Secretary argues that this procedural violation (if one occurred at all) was harmless. The history of the listing process involving slickspot peppergrass seems to indicate otherwise – the Service withdrew proposed listings on more than one occasion after receiving comments from the State or those representing the State's interests. If that were not sufficiently concrete in itself, the State's loss of land management is sufficiently concrete. *See Maine v. Norton*, 257 F.Supp.2d 357 (D. Me. 2003) (holding that Maine had standing to challenge the listing of Atlantic Salmon under the ESA based upon the State's interests in managing its own natural resources and enacting and enforcing its own legal code).

### B.    The Ranchers' Standing

Defendants also argue that Plaintiffs Theodore Hoffman, Scott Nicholson, and L.G. Davison & Sons, Inc. (the "Ranchers") have failed to demonstrate any injury flowing from the agency's Final Rule listing slickspot peppergrass as threatened and that

**MEMORANDUM DECISION AND ORDER - 24**

they therefore lack standing under Article III of the Constitution.

Plaintiffs Hoffman and Nicholson are ranchers and L.G. Davison & Sons, Inc. is a ranching business. It is undisputed that the Ranchers conduct their operations in the State of Idaho under permits issued by the Bureau of Land Management ("BLM") within allotments containing slickspot peppergrass and that the Ranchers are signatories to the CCA. In their amended complaint, the Ranchers allege they "have been actively involved in the consideration of Slickspot peppergrass as a listed species by Defendants[;]" and that they "have voluntarily implemented a number of Slickspot peppergrass conservation measures by and through the CCA and incorporated those measures into existing permits[.]" (Dkt. 13 at ¶ 15.) Concerning their injury, the Ranchers allege that, if the listing is upheld, their "ranching operations will be subject to and potentially curtailed by and through the section 7 consultation process for both ongoing and future grazing permits as well as the designation of critical habitat under section 4 of the ESA." (*Id.*)

In response to Defendants' motion for summary judgment seeking dismissal of the Ranchers' claims for lack of standing, Plaintiffs submitted the declaration of Dr. Hoffman. (Dkt. 44-2.) Dr. Hoffman's declaration represents that he, Mr. Nicholson and L.G. Davison & Sons, Inc. are all non-governmental cooperators and signatories to the CCA. He also states that his ranch includes private and state land leases, as well as land under permit from the BLM. Moreover, Dr. Hoffman states that his cattle graze in the vicinity of slickspot peppergrass habitat on the Snake River Plain.

**MEMORANDUM DECISION AND ORDER - 25**

Dr. Hoffman identifies the following injury he will sustain as a result of the listing:

> If the listing of Slickspot peppergrass is permitted to stand, our respective and collective voluntary efforts under the CCA will be rendered null and void. Further, my grazing permit and the BLM's land use decisions will be the subject of consultation regarding jeopardy to the plant. . . . These subsequent land use restrictions will impact both my private property values and my ability to use that property whether it be for ranching, farming, development, subdivision, or otherwise. Likewise, I will also have my grazing permits altered to comport with habitat conservation measures. All of these restrictions will redound to my detriment as I attempt to manage renewable natural resources in a sustainable manner to provide income for my family and a nutritious food supply to consumers in Idaho and beyond.

(Dkt. 42-2 at ¶¶ 9 and 10.)

In response, Defendants assert that Dr. Hoffman already has undergone Section 7 consultation under the ESA, and the two resulting Biological Opinions each concluded that the grazing operations would not cause jeopardy to the continued existence of the slickspot peppergrass. Defendants' argument misses the point of the standing analysis. The question is not whether the Ranchers' operations will be allowed to continue, but whether the listing has caused "an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (quotations, citations omitted).

The very fact that the Ranchers' operations have been subjected to Section 7 consultation under the ESA supports the finding that the Ranchers have standing. *See Hydro Resources, Inc. v. EPA*, 562 F.3d 1249, (10th Cir. 2009) ("the unwanted result of

**MEMORANDUM DECISION AND ORDER - 26**

the government rule whether or not [there was an associated] pecuniary loss suffices as an injury in fact.") (alteration in original, quotation marks omitted) (*vacated on other grounds in* 608 F.3d 1131 (10th Cir. 2010)). In a similar vein, it is reasonable to infer from Plaintiffs' amended complaint and Dr. Hoffman's declaration that the Ranchers have (or had) certain business expectations related to the viability of their operations under the strictures of the CCA and that these expectations have been altered due to the listing. This too supports a finding that the Ranchers have standing. *See Alabama-Tombigbee Rivers Coalition v. Norton*, 338 F.3d 1244, 1254 (11th Cir. 2003) (holding that a coalition of businesses had standing to challenge a listing under the ESA based upon the finding that "[t]he listing adds another layer of concrete economic considerations that may be in tension with the members' pre-listing assumptions").

Finally, the Biological Opinion, which concluded that continued cattle grazing for a period of three years under the BLM permits would not jeopardize the slickspot peppergrass, actually undermines Defendants' argument. Indeed, the Biological Opinion lists several conservation measures for the BLM to implement. (Dkt. 47-1 at 44.) These include the continued implementation of measures contained in the CCA, but recommend additional measures. The Court finds that this additional layer of federal regulation imposed upon the Ranchers' operations is sufficient to confer standing.

## 2.     Best Available Science

Plaintiffs argue that the Service violated the best available science mandate for several reasons, primarily taking issue with the Service's use of the OTA data as evidence

**MEMORANDUM DECISION AND ORDER - 27**

of a rangewide negative population trend. Plaintiffs argue that the Service was aware that the data from the OTA census program was not what it purported to be – it was a rough census rather than an actual census in which each plant was counted – and that the reliance upon that data violated the best available science requirement. Plaintiffs also assert that the Service did not communicate the shortcomings of the OTA data to Sullivan and Nations for their statistical analysis of the OTA data. Ultimately, Plaintiffs disagree with the Service's conclusion that the available data demonstrates a negative population trend and assert that the evidence actually shows that slickspot peppergrass populations are stable. The gist of Plaintiffs' argument and their overriding concern appears to be the fact that the Service relied on the same data that was available in 2007 – when the Service determined that a listing was not warranted – to justify the listing in 2009. Plaintiffs argue that the Service has flip-flopped, and that this does not comport with the best available science mandate.

### A.    Legal Standard

Under 16 U.S.C. § 1533(b)(1)(A), an agency must discharge its ESA duties, including listing determinations, "solely on the basis of the best scientific and commercial data available . . . after conducting a review of the status of the species and after taking into account those efforts, if any, being made by any State or foreign nation, or any political subdivision of a State or foreign nation, to protect such species." The best available science requirement "merely prohibits [an agency] from disregarding available scientific evidence that is in some way better than the evidence [the agency] relies on."

**MEMORANDUM DECISION AND ORDER - 28**

*Kern Co. Farm Bureau v. Allen*, 450 F.3d 1072, 1080 (9th Cir. 2006) (citation omitted).

In other words, the agency "cannot ignore available biological information." *Id*. at 1080-81. On the other hand, "absent superior data . . . occasional imperfections do not violation § 1533(b)(1)(A)." *Allen*, 450 F.3d at 1081, citing *Building Indus. Ass'n of Superior Cal. v. Norton*, 247 F.3d 1241, 1246 (D.C. Cir. 2001). The statute contains no requirement of absolute scientific certainty – assuming such a thing exists – to justify listing a species, but rather requires application of the best science available. *Defenders of Wildlife v. Babbitt*, 958 F.Supp. 670, 679-81 (D. D.C. 1997).

      **B.**    **Analysis of the 2009 Final Rule**

           (1) *population trend*

      The 2009 Final Rule begins its discussion by describing the characteristics of slickspot peppergrass and its habitat and the monitoring programs that have been used to collect data on the species. (AR 2-10.) In evaluating the value of the data monitoring programs, the Service states that, due to the highly variable nature of annual precipitation and plant abundance, "the numbers of years included in the data set for evaluation is of great importance in determining the degree of confidence in the outcome of any statistical analysis." (AR 0008.) "For this reason, [the Service concluded that] the Sullivan and Nations evaluation of the 18-year dataset from the OTA is the best available data regarding the relationship between precipitation and abundance of *L. papilliferum*." (*Id*.) Because Plaintiffs take issue with the Service's reliance on this data, it should be noted that the data sets from the HII and HIP monitoring programs were considered but found

**MEMORANDUM DECISION AND ORDER - 29**

less reliable due to the relatively short amount of years that those programs covered. It should also be noted that the Service accurately characterizes the OTA census data as a "rough censes," (AR 0005), which belies Plaintiffs contention that the value of the OTA data was overestimated.

The Final Rule continues with a discussion of the population trend for slickspot peppergrass, and recognizes at the outset that any attempt to analyze the population trend for the species is complicated by multiple factors, which ultimately diminishes the value of any conclusion concerning the population trend for the species. (AR 0010.) The Final Rule identifies the following factors complicating the population trend analysis:

> For one, since individuals of the species may act as either an annual or a biennial, in any given year there will be varying numbers of plants acting as spring-flowering annuls verses overwintering rosettes. The relative proportions of these two life history forms can fluctuate annually depending on a variety of factors . . . . Second, *L. papilliferum* has a long-lived seed bank, likely as an adaptation to unpredictable conditions, in which years of good rainfall favorable for germination and survival may be followed by periods of drought; a persistent seed bank provides a population buffer against years of poor reproductive potential in such a highly variable environment. . . . The presence of this persistent seed bank confounds the ability to determine any trend in abundance over time, as the number of above-ground plants that can be counted in any one year represents only a subset of the latent population that is present in the seed bank. In effect, it takes at least 12 years to trace the fate of a single year's cohort of seeds, resulting in a significant lag effect in detecting any real underlying change in total population abundance over the long term.

(AR 0010.) Given these complications, the Final Rule notes from one report that

**MEMORANDUM DECISION AND ORDER - 30**

"estimating the number of above-ground plants is by itself not a reliable measure to evaluate population and species viability." (AR 0011, quoting Mancuso and Moseley.) The same referenced report also states that monitoring the integrity of the species habitat quality and quantity could act as an alternative or supplement to population monitoring. (*Id*.) The Final Rule notes that "[h]abitat monitoring is a recommended method of monitoring annual plants with a long-lived seed bank." (*Id*.)

Concerning the data sets, the Service states: "we weighed the relative quality of the available datasets for discerning population trend . . . according to the degree of confidence we had in the results of any analyses, given the great degree of variability observed and the multiple factors potentially influencing annual counts of the plant." (*Id*.) In this regard, the Service found the OTA datasets, including the rough census areas and special-use plots, the best available data, which provide 18 years of population monitoring information. (*Id*.)

Based on the count data from the OTA special-use plots, Sullivan and Nations concluded that "there was not sufficient evidence to conclude that the slope of abundance over time was significantly different from zero." (AR 0012.) In other words, the special-use plots did not provide evidence of a negative population trend. Sullivan and Nations did find, however, that the data from the OTA rough censes program provided "limited evidence for declining populations." (*Id*.)

Ultimately, the Service recognized that "[t]he extreme variability in annual counts of the species makes it difficult to discern a trend in numbers with statistical confidence."

**MEMORANDUM DECISION AND ORDER - 31**

(AR 0012.) Recognizing this limitation, the Service concluded that "[t]he long-term data from the OTA, which [the Service] considered to be the best available data . . . suggest that population numbers may be trending downward on the OTA." (*Id*.) The Service also noted, however, that the "OTA provides some of the highest quality habitat remaining for *Lepidium papilliferum*," and the agency believed it was reasonable "to infer that if the population is trending downward there, then conditions are likely worse in the remainder of the plant's range where habitat conditions are more degraded." (AR 0012-13.) In weighing all of the available information, the Service concluded that "the best available evidence suggests that *Lepidium papilliferum* numbers *may be* trending downward." (AR 0013) (emphasis added). Finally, concerning population trend, the Service notes that "it would be inappropriate to rely on this model to predict any future population trajectory for *L. papilliferum*." (*Id*.)

The above discussion illustrates that the Service was quite conservative with its conclusions related to population trend. This is in line with the 2007 withdrawal notice, which concluded that there was insufficient evidence relating to population trend to list the species under the ESA. The above discussion also demonstrates, contrary to Plaintiffs' position, that the Service considered the tentative negative population trend finding when listing the species. Indeed, as the discussion below illustrates, the Service relied not on population trend evidence in justifying the listing of the species, but on the finding that various factors were contributing to the degradation of the species' habitat.

**MEMORANDUM DECISION AND ORDER - 32**

Based upon the above discussion, the Court finds that the Service did not violate the best available science requirement by characterizing the OTA data as the best available data related to population trend.

(2)    *Habitat*

As noted above, Section 4 of the ESA sets forth five factors for the Service to evaluate whether a species may be determined to be endangered or threatened. 16 U.S.C. § 1533(a)(1). A finding that any one of the factors has been met is sufficient to list the species. In this case, the Service relied on factor "A" – the present or threatened destruction, modification, or curtailment of the species' habitat or range.

Following the discussion of population abundance, the 2009 Final Rule discusses the species' habitat and the threats to its habitat. (AR 0013-31.) The discussion begins with the statement that Sullivan and Nations "found a significantly negative relationship between the abundance or density of *Lepidium papilliferum* and both the presence of *B. tectorum* [an invasive nonnative plant] and past fire." (AR 0013-14.) This relationship is described in the Final Rule as follows: "The complex and positive feedback loop between the encroachment of invasive annual grasses such as *B. tectorum*, increased fire frequency, and decreased integrity of biological soil crusts contributes to the degradation of sagebrush-steppe habitat quality for *L. papilliferum*." (AR 0014.) In layman's terms, the encroachment of nonnative plants near the slickspots have increased the available fuel for wildfires and have resulted in more frequent fires. Moreover, "[s]ince post-fire conditions are favorable for further invasion . . . of nonnative annual grasses, invasive

**MEMORANDUM DECISION AND ORDER - 33**

grasses soon dominate the community." (AR 0016.) These conditions have led to "the establishment of an invasive grass-increased fire frequency cycle." (*Id*.)

Although the Service previously recognized wildfire as a threat to slickspot peppergrass, the Sullivan and Nations report provided "[n]ew evidence suggest[ing] . . . a significant negative association between cover of nonnative plant species and wildfire and the abundance of *L. papilliferum*, such that the species appears to be in decline across its range, with adverse impacts continuing and likely increasing into the foreseeable future." (AR 0015.) Sullivan and Nations found a consistent, statistically significant negative correlation between wildfire and the abundance of *L. papilliferum* across its range. (AR 0017.) "Their analysis if 5 years of HIP monitoring data indicated that *L. papilliferum* abundance was lower within those slickspot[s] . . . that had previously burned, and the relationship between *L. papilliferum* abundance and fire is reported as relatively large and statistically significant, regardless of the age of the fire or the number of past fires." (*Id*.) (quotation marks and citations omitted.)

Summarizing its discussion of wildfire as a threat to the habitat of slickspot peppergrass, the Final Rules provides:

> The observed increases in frequency and geographic extent of wildfires, the negative consequences for *L. papilliferum* and its habitat associated with the invasion of nonnative grasses and wildfire, the strong positive feedback loop between wildfire and conversion of sagebrush-steppe to annual grasslands, and the lack of effective rangewide control mechanisms all contribute to the current modified wildfire regime being the greatest ongoing threat to *L. papilliferum's* existence.

**MEMORANDUM DECISION AND ORDER - 34**

(AR 0018.) The Service also concluded that "the best available data indicates that fire frequency is likely to increase in the foreseeable future." (*Id*.)

The Service next discusses the other threats to the habitat of slickspot peppergrass, including invasive nonnative plant species, development, and livestock use, but ultimately concludes that combination of wildfire and invasive plants poses the most significant threat to the species and that wildfire mitigation efforts have not been successful. Given these findings, the Service determined under § 1533(a)(1) that wildfire and invasive nonnative plants pose a significant threat to the viability of the species throughout its range, "such that [the Service] anticipate[s] *L. papilliferum* is likely to become an endangered species within the foreseeable future." (AR 0031.)

The Service's finding underlying the above conclusion are supported by the administrative record and entitled to deference. *See Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 103 (1983). Moreover, Defendants are correct that this finding was sufficient to list the species.

### 3.    Foreseeable Future

The ESA defines "threatened" as "likely to become an endangered species within the *foreseeable future* throughout all or a significant portion of its range." 16 U.S.C. § 1532(20) (emphasis added). Here, the Final Rule defines foreseeable future "to be that period of time over which events can reasonably be anticipated." (AR 0043.) Plaintiffs argue that this definition is wholly inadequate under the ESA, that it undermines the entire listing analysis, and that it requires vacatur of the Final Rule and remand for further

**MEMORANDUM DECISION AND ORDER - 35**

consideration.

Judicial review of an agency's interpretation of a statute is governed by the two-part formula announced in *Chevron v. Natural Resource Defense Council*, 467 U.S. 837 (1984). A court reviewing an administrative interpretation of a statute must first ask "whether Congress has directly spoken to the precise question at issue." *Id*. at 842. If the statute is unambiguous, then the court "must give effect to the unambiguously expressed intent of Congress" regardless of the agency's view. *Id*. at 843. However, if the statute is silent on the matter, or ambiguous with respect to the specific issue, then the court must defer to the agency's interpretation unless that interpretation is unreasonable. *Id*. at 843-44.

The ESA does not define the term "foreseeable future" and the Service has not promulgated any rules or regulations setting quantitative thresholds to define the term. The first question under *Chevron* is whether "foreseeable future" is ambiguous. This prong is not at issue, as the parties agree that the ESA is silent on the issue and that *Chevron* applies. The second prong of the analysis is whether the agency's interpretation is reasonable. On this prong, the parties disagree.

The Service's definition of "foreseeable future" is limited to the following eleven words: "that period of time over which events can reasonably be anticipated." (AR 0043.) Presumably, this definition stems from the Court's 2005 decision, in which the Court began its discussion of this very issue with a definition of "foreseeable" from *Merriam-Webster's Dictionary of Law* as "such as reasonably can or should be anticipated." *Foss*,

**MEMORANDUM DECISION AND ORDER - 36**

2005 WL 2002473 at *15. The Court, however, in no way endorsed this definition as the definition of "foreseeable future" under the ESA. Instead, the Court specifically stated that "the definition of "foreseeable future" may vary depending on the particular species." *Id.* at *16. The definition of "'foreseeable future' may be defined differently for a sequoia tree (the National Park Service indicates an age of 3,200 years for a mature tree) than for the slickspot peppergrass, which is an annual or biennial plant." *Id.*

Defendants were not without guidance on this issue. The Court noted in its 2005 decision that "[t]he FWS own experts recommended that the timeframe the panel should have considered with respect to 'foreseeable future' was 60 to 100 years." *Id.* at *15. Similarly, in the 2008 case, it was noted that "[t]he first manager panel defined the foreseeable future as not greater than 40 years based on the species' biology, habitat threats, and other factors." Moreover, other federal environmental agencies have constructed workable definitions of "foreseeable future" for other species, and while the Service was not required to look to those definitions in its analysis of *L. papilliferum*, "they are certainly instructive." *Foss*, 2005 WL 2002473 at *16. Plaintiffs also point out that the Service used the life cycle of the sage-steppe ecosystem to define foreseeable future for the sage-grouse. *See* 70 Fed. Reg. 2281 (Jan. 12, 2005) (using approximately 30 to 100 years (about 10 greater sage-grouse generations to 2 sagebrush habitat regeneration cycles)).

Defendants argue that the Court should defer to the Service's definition because it is consistent with the U.S. Department of the Interior Solicitor's *M-Opinion 37021: The*

**MEMORANDUM DECISION AND ORDER - 37**

*Meaning of 'Foreseeable Future' in Section 320 of the Endangered Species Act* (Jan. 16, 2009). In that opinion, the Solicitor opined that "[b]ecause a species may be susceptible to a variety of threats for which different data are available, or which operate across different time scales, [the Service's] ability to make reliable predictions may vary according to the threat at issue. Consequently, the foreseeable future is not necessarily reducible to a particular number of years." The opinion also states that "quantifying the foreseeable future in terms of years may add rigor and transparency to [the Service's] analysis if such information is available." Finally, the opinion states that quantification is "not required for a 'foreseeable future' analysis."

The Court finds that the Service's definition in this case is not supported by the *M-Opinion*. The *M-Opinion*, like the Court's 2005 decision, makes clear that the definition of foreseeable future is to be made on a species-by-species basis and through an analysis of the time frames applicable to the particular species at issue. The Service's definition in this case is not species specific. The definition provided by the Service makes no reference to the actual species at issue. In fact, if this Court upheld the definition, it could conceivably be used for any species. It is generic on its face. The ESA requires more.

Not only were Defendants on notice through the Court's 2005 decision that they must provide an adequate definition of "foreseeable future," but the requirement that the Service provide a definition simply does not seem that arduous. The agency has been provided multiple definitions of "foreseeable future" by multiple scientists and groups of scientists throughout the listing process involving slickspot peppergrass. The Service

**MEMORANDUM DECISION AND ORDER - 38**

seems to have simply thrown up its hands after two previous remand orders from this Court and thrown in the towel on this issue. The Court finds no problem with the agency's science. But without a viable definition of foreseeable future, there can be no listing under the ESA.

As Plaintiffs argue, the failure to provide an adequate definition of foreseeable future undermines the entire listing. Plaintiffs posit the following question: "how can the Secretary discern whether the species is 'likely' . . . to become an endangered species [within the foreseeable future] without knowing the accompanying time horizon for making this determination?" (Dkt. 44 at 19.) The question is well taken. Plaintiffs also accurately point out that the ESA requires conservation measures "necessary to bring any . . . threatened species to the point at which the measures provided pursuant to this Act are no longer necessary." 16 U.S.C. 1531(3). Without a properly calibrated definition of foreseeable future, Plaintiffs' concern that the species will be perpetually listed is well-founded.

Based upon the above, the Court will vacate the listing on this issue and remand to the Secretary for further consideration consistent with this decision.[10]

---

[10] During the hearing on the parties' cross motions for summary judgment, Defendants argued that, if the Court found problems with the Service's definition of foreseeable future, the Court should remand the case without vacating the Final Rule. In support of their argument, Defendants directed the Court to *In re Polar Bear Endangered Species Act Listing and § 4(D) Rule Litigation*, 748 F.Supp.2d 19 (D.D.C. 2010). In that case, the court found the phrase "endangered species" in the ESA was ambiguous and remanded the case – without vacating the listing – for the Service to interpret the phrase, which would then be binding on the court under *Chevron* unless the agency's

**MEMORANDUM DECISION AND ORDER - 39**

4.      **Consideration of Conservation Measures**

A listing determination under the ESA may be made only "after taking into account those efforts . . . being made by any State . . . to protect the species." 16 U.S.C. § 1533(b)(1)(A). Additionally, the Secretary must consider the "inadequacy of existing regulatory mechanisms." 16 U.S.C. § 1533(a)(1). Plaintiffs argue that the Secretary did not comply with these provisions and failed to adequately consider the conservation measures undertaken by the State of Idaho to protect *L. papilliferum*. Specifically, Plaintiffs direct the Court to the CCA and argue that it should have been given more weight in the listing determination. Plaintiffs also note that the Service relied upon the CCA as a basis for withdrawing its proposed listing in 2004 and again referenced the CCA in its 2007 notice of withdrawal.

Defendants argue that the State's conservation efforts were given consideration in the listing determination and that, in light of recently updated information about threats to the species, the conservation efforts were found not to have adequately addressed (or

_____

interpretation was found to be unreasonable. The court also stated that, "[i]n ordering a limited remand, the Court does not require the agency to conduct additional fact-finding." *Id*. at 30 n.18.

Here, the Court finds the circumstances distinguishable from those involved in the Polar Bear litigation. In this case, the Court is not seeking an agency interpretation of an ambiguous statutory phrase. Rather, the parties in this case concede that the phrase in issue is ambiguous, and the Court has found that the Service's definition of the ambiguous phrase is unreasonable under *Chevron*. Furthermore, the remand may very well require additional fact-finding; the Service may decide that an expert panel needs to be reconvened to offer an opinion on what constitutes the foreseeable future for the slickspot peppergrass. Given these considerations, the Court finds that vacatur is appropriate in this case.

**MEMORANDUM DECISION AND ORDER - 40**

capable of addressing in the future) the threats of wildfires and invasive nonnative plants.
The listing decision states that "[c]urrently, there are no feasible means of controlling the
spread of *B. tectorum* or the subsequent increase in wildfire frequency and extent once *B.
tectorum* is established." (AR 0023.) Based upon a review of the listing, the Court finds
that it was reasonable for the Service to conclude that the CCA's "effectiveness in
reducing or eliminating the most significant threats has not been demonstrated." (AR 37.)

## 5.    Compliance with Section 4(i)

Under Section 4(i) of the ESA, if the Service receives comments from a state
disagreeing with all or part of a proposed listing, and the agency subsequently issues a
final rule that conflicts with those comments, it must then provide the State with a
"written justification" explaining its failure to adopt regulations consistent with the
agency's comments. 16 U.S.C. 1533(i).

It is undisputed that the State of Idaho submitted comments in this case and that
the Final Rule was contrary to those comments. The Governor claims that the State did
not receive the letter contemplated by Section 4(i). Defendants explain, in a declaration
submitted by Dr. Michele Zwartjes, that a draft letter in compliance with Section 4(i) was
completed by the Service's regional and field offices and sent to the Service's
headquarters in D.C. The regional office believed that the D.C. office would sign and
deliver the letter to the Governor. The D.C. office believed that the regional office would
send the letter to the Governor. Because of this mix up, no letter was sent to the State

**MEMORANDUM DECISION AND ORDER - 41**

until after this litigation was initiated.

Notwithstanding the mix-up, Defendants argue that they satisfied Section 4(i) by addressing the State's comments in the listing. (Dkt. 43 at 27, citing *In re Polar Bear Endangered Species Act Listing and 4(d) Rule Litigation*, 794 F.Supp.2d 65, 115 (D. D.C. 2011).) Defendants also argue that, even if the failure to send the letter constituted error, the error was harmless. Because the Court has found that the listing must be vacated and the case remanded to the agency to define "foreseeable future," the Court need not resolve this issue.

## ORDER

Based on the foregoing, the Court being otherwise fully advised in the premises,

**IT IS HEREBY ORDERED that**:

1.      Plaintiffs' Motion for Summary Judgment (Dkt. 38) is GRANTED. The Secretary of the Interior's Final Rule listing *L. papilliferum* as a threatened species under the Endangered Species Act is hereby vacated and the matter is remanded for further consideration consistent with this decision.

2.      Defendants' Motion for Summary Judgment (Dkt. 42) is DENIED.



DATED: August 8, 2012

Honorable Candy W. Dale
Chief United States Magistrate Judge

**MEMORANDUM DECISION AND ORDER - 42**